**Alfredo R. ARRIOLA, et al.,
Plaintiffs-Appellants,**

v.

**T.L. HARVILLE, et al.,
Defendants-Appellees.**

No. 84–2421.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1986.

Judith A. Sanders-Castro, MALDEF, Jose Garza, Jose Roberto Juarez, Jr., San Antonio, Tex., Morris J. Baller, Joaquin G. Avila, San Francisco, Cal., for plaintiffs-appellants.

Perkins, Oden, Warburton, McNeill & Adami, J.G. Adami, Alice, Tex., for defendants-appellees.

Irving Gornstein, Jessica Dunsay Silver, Attys. Civil Rights Div., Dept. of Justice, Washington, D.C., for U.S.A., amicus.

Before GOLDBERG, JOLLY, and HIGGINBOTHAM, Circuit Judges.

## OPINION

E. GRADY JOLLY, Circuit Judge:

█ We hold today that attorney's fees may not be awarded to prevailing plaintiffs under the Voting Rights Act for services rendered in preclearance submissions to the Attorney General under Section 5 of the Voting Rights Act of 1965, as amended.[1] 42 U.S.C. § 1973c. We therefore affirm the holding of the district court.

### I

In 1974 Jim Wells County in south central Texas submitted a reapportionment plan for commissioner precincts to the district court, which approved the plan. The county, however, adopted a new plan in 1975, and the defendant Harville, a county judge, sent the Justice Department a letter informing them of the change. The Justice Department did not respond the Harville's letter. It apparently did not view the letter as an attempt to seek preclearance to the 1975 plan under the Voting Rights Act. Nevertheless, Jim Wells County conducted elections from 1975 to 1979 in accordance with the unprecleared 1975 plan.

The county did submit the plan for preclearance review in 1977. The plaintiff Arriola and others, represented by the Mexican-American Legal Defense Fund (MALDEF), submitted objections to the Justice Department. In 1978 the Justice Department rejected the proposed plan.

The plaintiffs then filed an action under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. They sought an injunction to prevent further elections under the 1975 plan and to order the county to develop a new plan. Despite the county's argument that the 1975 letter to the Justice Department was a submission to which the Department had failed to object, MALDEF succeeded in enjoining further use of the 1975 plan in October 1979. MALDEF, however, failed to prevent the 1978 elections.

Because of the injunction, Jim Wells County then submitted three plans in succession to the Justice Department for preclearance. After rejecting the first two plans, the Justice Department precleared the third. MALDEF objected to each and submitted alternative plans. In its first plan, MALDEF urged three districts, each with a Mexican-American population of sixty-five percent. It then submitted two more plans with similar Mexican-American percentages. In addition to submitting proposed plans, MALDEF undertook other activities in connection with the preclearance process, primarily lobbying with county and federal officials.

The Justice Department cleared the final plan submitted by Jim Wells County. Compared to the county's first plan, this plan increased the number of commissioner pre-

---

1. As will be evident from our later discussion, this holding does not preclude compensation for services rendered in a preclearance submission that bear directly on the issues in an independent lawsuit and where that work is required and necessary to resolve the issues of the independent lawsuit.

cincts with Mexican-American population percentages of at least sixty-five percent from one to three. After this plan had been accepted, no further action was taken in the pending lawsuit except for matters connected to MALDEF's efforts to obtain attorney's fees and costs.

After the plan was accepted, MALDEF petitioned the district court for attorney's fees and costs. While granting fees incurred in obtaining the initial injunction, the district court denied all fees and costs for services rendered after MALDEF obtained its injunction. In denying these fees, the district court followed the test laid out in *Posada v. Lamb County, Texas*, 716 F.2d 1066, 1075 (5th Cir.1983), requiring that one claiming fees for services in the section 5 preclearance process show that his "participation, through particularly astute criticism or creative legal argument, changed the result that the Attorney General would otherwise have reached." MALDEF presented evidence to the court that compared their proposed plans and the plan finally accepted by the Justice Department, and argued that the Justice Department had apparently reacted to its objections. The court found, however, that MALDEF had not met the *Posada* standard because this evidence did not show that MALDEF had caused the Justice Department to reach a result different from one that they would otherwise have reached. MALDEF appeals the district courts' denial of fees incurred in the preclearance, the denial of all costs and the reduction of its hourly rate for travel.

## II

MALDEF maintains that the district court abused its discretion when it denied fees for services rendered in the preclearance submission because the submission was part of the litigation to enforce section 5 of the Voting Rights Act. According to MALDEF, the suit for an injunction was not over because the district court retained

jurisdiction and had a continuing obligation to secure compliance with the injunction. Furthermore, MALDEF argues that the objectives of the litigation had not all been achieved when the injunction was granted because the county did not yet have a plan that had at least three Mexican-American districts with population percentages of sixty-five percent or greater. MALDEF characterizes the preclearance submission as the "remedy phase" of the injunction suit, and argues that the only effective relief Voting Rights Act plaintiffs will usually obtain comes through the preclearance submission process.

MALDEF further argues that a recent Supreme Court decision in a section 1988 case provides the standard for the award of attorney's fees for collateral administrative proceedings in Voting Rights Act cases. *Webb v. Board of Education of Dyer County*, — U.S. —, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985). In *Webb*, the Supreme Court noted that the petitioner there had not suggested "that any discrete portion of the work product from the administrative proceedings was work that was both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement." *Id.*, 105 S.Ct. at 1929. MALDEF argues that the work it did in connection with the preclearance submission meets this standard as both useful and necessary to advance the voting rights litigation in this case.

Jim Wells County maintains that the district court correctly applied the *Posada* standard that controls the award of attorney's fees in this case. The county argues that MALDEF did not show the impact on the Justice Department's decision that that standard required. The county also argues that MALDEF could not recover attorney's fees for services rendered in preclearance submissions because they were not "prevailing parties" in an "action or proceeding" as section 14 of the Voting Rights Act, the attorney's fee provision, requires.[2]

---

**2.** The United States as *amicus curiae* joined most of the county's arguments but also emphasized the harmful effect that implementation of

*Posada's* standard would have on Justice Department operations. The United States asked us to abandon that part of *Posada* that suggested a

## III

Today we decide an issue left open by *Posada:* whether attorney's fees may be awarded under section 14 of the Voting Rights Act, 42 U.S.C. § 1973*l*(e), for services rendered in a preclearance submission to the Attorney General under section 5 of the Act. *Posada,* 716 F.2d at 1074. In *Posada,* while pretermitting the ultimate question, we said that if fees were available at all, a petitioner must show that his participation in the preclearance process changed the result that the Attorney-General would have reached, and that the change was accomplished through counsel's "particularly astute criticism or creative legal argument."

To decide this issue, we must first determine whether the preclearance submission is itself an "action or proceeding." If the submission is neither, we must decide whether the services rendered in the preclearance submission were compensable as part of another proceeding, that is, the lawsuit seeking the injunction under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

## IV

### A.

The question whether a preclearance submission is an action or proceeding and thus whether attorney's fees can be awarded in a section 5 preclearance submission depends on the intent of Congress when it created the preclearance submission and the attorney's fee provision.

The Voting Rights Act requires specified state and local governments to seek approval of any change from a previously approved election plan through a declaratory judgment action brought in the District of Columbia. The Act also provides a more expeditious way of obtaining federal approval of election changes: the state or local government may submit the proposed change to the Justice Department and have

it precleared. If the Justice Department does not object to the change within sixty days, then the state or local government may implement the precleared change. Voting Rights Act § 5, 42 U.S.C. § 1973c. The plan to which the Justice Department fails to object may then be implemented, and the Justice Department's decision not to object to the plan cannot be challenged in court. However, the plan itself can be challenged in a later action. .

Congress also allowed successful plaintiffs in voting rights cases to recover attorney's fees. "In any *action or proceeding* to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow *the prevailing party,* other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1973*l*(e) (emphasis added).

The wording of the statute requires us to determine whether a preclearance submission is an "action or proceeding." Congress' use of the term "action or proceeding" is important in discerning its intent, especially since Congress used different terms for preclearance submissions and for actions or proceedings. For example, in the first part of section 5, 42 U.S.C. § 1973c, the terms "action" and "proceeding" are consistently used to refer to the lawsuits brought to prevent the implementation of an unconstitutional election change. In the latter part of section 5 that describes the preclearance process, the words "action" and "proceeding" do not appear, except to refer to lawsuits brought to prevent the implementation of the election change or to lawsuits brought to challenge an election change to which the Justice Department has failed to object. In other words, the drafters consistently avoided using the terms "action" or "proceeding" to describe the preclearance process. *See Gerena-Valentin v. Koch,* 739 F.2d 755, 760, n. 2 (2d Cir.1984) (excerpts from legislative history of section 14).

---

standard for recovering attorney's fees that would examine the impact of petitioners on the Justice Department's decision because petition-

ers might seek to require Justice Department officials to testify concerning their decisional process.

■ The term that Congress employed for compensable activities, "action or proceeding," commonly refers to some sort of adversary proceeding in the nature of a traditional lawsuit. The preclearance process bears little resemblance to such an action or proceeding. There is no plaintiff nor defendant; no pleadings nor formal procedural rules; no judge nor jury; no requirement for a ruling nor judgment; no procedure to enforce or implement. Moreover, unlike the traditional lawsuit, a Justice Department decision not to object to an election change cannot be reviewed. *Briscoe v. Bell*, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977). The Justice Department has plenary authority over the preclearance submission, and it need not consider any of the objections or comments filed by third parties such as the appellant. The preclearance submission and decision are executive rather than judicial in nature because the Justice Department need not consider the comments of those submitting them, and can base its decision entirely on its own independent investigation if it so wishes. All these factors indicate the nonjudicial character of the preclearance process and decision. The preclearance process was developed to enable state and local governments to *avoid* a judicial decision in an "action or proceeding," and to give them a quick decision on their election changes. *Morris v. Gressette*, 432 U.S. 491, 503–04, 97 S.Ct. 2411, 2419–20, 53 L.Ed. 2d 506 (1977).

The congressional intent to award attorney's fees for proceedings in the nature of traditional lawsuits also is illustrated by the fact that Congress used the term "prevailing parties" to describe those persons who should be awarded attorney's fees. Third parties who, like appellant, submit comments to the Justice Department are not "prevailing parties" with respect to a preclearance submission, because they are not parties at all. Section 5 of the Voting Rights Act, the provision that establishes the violations on which a claim for attorney's fees is hinged, does not even mention

persons who submit comments to the Justice Department. The only rights that third parties in the preclearance process have are those afforded by Justice Department regulations under section 5. 28 C.F.R. §§ 51.27–51.30. These regulations carefully label persons providing comments on a preclearance submission as "interested individuals and groups" who submit "communications." 28 C.F.R. § 51.30.

These interested individuals and groups have none of the rights of parties. They cannot start a review, they cannot compel discovery, they have no right to be present when the submitting authority meets with the Attorney General, and they cannot obtain review of the Attorney General's decision.

We therefore conclude that Congress did not intend the term "action or proceeding" to include a preclearance submission, nor did it intend the term "prevailing parties" to include interested individuals and groups who submit comments to the Justice Department in preclearance submissions.

B.

Prior interpretations of section 14 of the Voting Rights Act and related statutes support the conclusion that Congress did not intend to award attorney's fees to participants in preclearance submissions. The Second Circuit recently denied attorney's fees under the Voting Rights Act for lobbying activities that were not closely related to a lawsuit. *Gerena-Valentin v. Koch* 739 F.2d 755 (2d Cir.1984). The *Gerena-Valentin* court carefully separated the claim for fees into those claimed in connection with the lawsuit and those claimed for activities solely connected to the preclearance process. The court concluded that neither the language nor the legislative history of the attorney's fee provision showed a congressional intent to award attorney's fees for activities solely connected to the preclearance process. *Id.* at 760–61.[3] The Supreme Court has recently de-

---

**3.** The appellants cite a line of cases that have awarded attorney's fees under the Voting Rights

Act or section 1988 for administrative proceedings. In the light of *Webb*, an analogy to these

termined that attorney's fees could not be awarded under 42 U.S.C. § 1988, the wording of which is almost identical to the statute relevant here, for a state administrative process completed *before* litigation under the Civil Rights Act, 42 U.S.C. § 1983. *Webb v. Board of Education of Dyer County,* — U.S. —, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985). The Court said, "The time that is compensable under section 1988 is that 'reasonably expended *on the litigation.'*" *Id.,* 105 S.Ct. at 1928 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (emphasis added in *Webb* )).

> When the attorney's fee is allowed "as part of the costs"—to use the language of the statute—it is difficult to treat time spent used before the complaint was filed as having been "expended on the litigation" or to be fairly comprehended as "part of the cost" of the civil rights action.

*Id.* Since the attorney's fee provisions of section 1988 and the Voting Rights Act are interpreted together, this reasoning should also be applied to time spent *after* the litigation has been completed under the Voting Rights Act. *See Donnell v. United States,* 682 F.2d 240, 245 n. 7 (D.C.Cir. 1982); *Riddell v. National Democratic Party,* 624 F.2d 539, 543 (5th Cir.1980); *Connor v. Winter,* 519 F.Supp. 1337, 1339 (S.D.Miss.1981) (three-judge court).

## C.

■ We must therefore turn to consider whether MALDEF's litigation terminated when it obtained an injunction against further use of the 1975 plan or whether the preclearance submission was a continuation of that litigation. There can be no question in this case that the litigation, as such, effectively terminated after the injunction. The record indicates that all docket entries in the case after the injunction relate to the seeking of attorney's fees. Furthermore, although, as MALDEF points out, the district court retained jurisdiction that jurisdiction was to insure compliance with the injunction, not to provide any further remedy. *Compare Trinidad v. Koebig,* 638 F.2d 846 (5th Cir.1981) (district court may order further relief if local government refuses to seek or cannot obtain preclearance).

MALDEF contends that the preclearance submission was the "remedy phase" of the injunction proceeding. This artfully chosen language attempts to portray an image of a plaintiff who has proved his case on the merits and who then automatically proceeds to the next step, in the same litigation involving the same parties, of proving the relief to which he is entitled. This image of the preclearance submission is hardly an accurate portrayal. First, the preclearance submission is separate from the lawsuit. The participants are not the same. The preclearance process is in a different forum. It follows different law. In fact as we discussed above, it is not a judicial proceeding at all. There need be no connection between the lawsuit and the preclearance submission. Second, the "remedy phase" language is an inaccurate description because it suggests that the participant in a preclearance submission is a party. As we noted above, the preclearance submission is entrusted to the Attorney General, who invites comments to aid

cases is now fatally flawed because they rely, directly or indirectly, on Title VII, which requires that claimants exhaust available administrative proceedings before they can bring their federal suit. *Stathos v. Bowden,* 728 F.2d 15, 22 (1st Cir.1984) (relying on *Chrapliwy* and *Bartholomew* ); *Ciechon v. City of Chicago,* 686 F.2d 511 (7th Cir.1982) (relying on *Carey* ); *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760 (7th Cir.1982) (Title VII); and *Bartholomew v. Watson,* 665 F.2d 910 (9th Cir.1982) (relying on *Carey* ); *Brown v. Bathke,* 588 F.2d 634, 638 (8th Cir. 1978) (cites Title VII cases). Many of these

cases rely on Title VII indirectly through *New York Gaslight Club v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980).

. *Webb v. Board of Education of Dyer County,* which involved a claim that, like the Voting Rights Act, does not require exhaustion of administrative remedies, distinguished Title VII cases on that basis, and explicitly held that the reasoning in those cases did not apply to the context of 42 U.S.C. § 1988, and that "therefore the reasoning in *Carey* is not applicable to this case." *Gerena-Valentin,* 739 F.2d at 761. *Webb,* 105 S.Ct. at 1927.

him in discharging his responsibility. Many persons submit comments who were not involved at all in lawsuits that may have preceded the preclearance submission. In the preclearance process the Attorney General accords no special privileges to those persons who brought the lawsuit. It is therefore inaccurate to view the Justice Department's decision as the remedy phase of the separate and distinct injunction proceeding.

In this case, the litigation ended after the injunction, and therefore the services rendered in the preclearance could not have been useful or required for the litigation. Without such a connection between the preclearance submission and the lawsuit, section 14 does not allow attorney's fees.

### V

■ The district court in this case, however, erred in its determination of the hourly rate. The district court used the hourly rate of the defense counsel as the lodestar for the fee award to the plaintiffs' counsel, but then the district court appears to have mistakenly used an hourly rate different from that charged by the defense counsel for travel time. The court said, "plaintiff's success in this case entitles it to the hourly rate charged by one of the defendant's attorneys, Kenneth Oden, an attorney of excellent reputation who has practiced in Jim Wells County for many years, which is $70 an hour *for all hours.*" (Emphasis added.) The result was that the "lodestar" defense counsel received $70 an hour for travel hours, and the appellants' attorney received only $20 an hour for travel hours. This was an abuse, perhaps unintentionally, of the district court's discretion. *See Wheeler v. Mental Health and Retardation Authority,* 752 F.2d 1063, 1073 (5th Cir.1985); *Carpenters Health and Welfare Fund v. Ken R. Ambrose, Inc.,* 727 F.2d 279 (3d Cir.1983).

The district court did not abuse its discretion, however, when it denied the plaintiff costs. MALDEF failed to submit evidence

on costs at the hearing, and its tardy submission did not separate costs into those incurred before and those incurred after the injunction was granted.

The district court's judgment is affirmed as to the denial of attorney's fees for hours spent in connection with the preclearance proceeding and for all costs, and reversed as to the rate set for hours devoted to travel. The district court should allow $70 an hour for travel hours proved by plaintiffs.

AFFIRMED IN PART, REVERSED IN PART.

GOLDBERG, Circuit Judge, dissenting:

I do not read the attorney's fees provisions of the Voting Rights Act, their legislative history, or the cases interpreting them as narrowly as the majority does. In particular, I do not agree that compensable pre-clearance activity under the Act is limited to "services ... that [are] required and necessary to resolve the issues of [an] independent lawsuit." *Supra* at 507 n. 1.

Participation in pre-clearance reviews may contribute to the advancement of litigation that indisputably gives rise to fee awards. The question is whether, because of its relation to prior litigation, the preclearance review in this case is an "action or proceeding" within the meaning of the Act, and whether appellant may be considered the "prevailing party."

The government relies heavily on *Gerena-Valentin v. Koch,* 739 F.2d 755 (2d Cir. 1984), in urging us to hold that pre-clearance reviews are never actions or proceedings and can therefore never give rise to fee awards. But in *Gerena-Valentin* the court stated merely that "The legislative history ... contains no suggestion that awards of attorney's fees can be made for work *solely in connection with preclearance reviews.*" *Id.* at 760 (emphasis added).[1] The court went on to note that "where the initiation of litigation is necessary to compel defendants to obtain pre-

---

1. *See also id.* at 760 n. 2 (Congress did not contemplate fee awards for work done in ad-

ministrative proceedings *"unrelated to successful litigation"*) (emphasis added).

**513**

clearance before holding an election, lobbying efforts in a preclearance review might bring the litigation to a quick and successful end, a goal consistent with the statutory purpose...." *Id.* at 759. The Supreme Court has recently acknowledged that such activity may be compensable if it is "both useful and of a type ordinarily necessary to advance the civil rights litigation." *Webb v. Dyer County Board of Education,* —— U.S. ——, 105 S.Ct. 1923, 1929, 85 L.Ed.2d 233 (1985).

This court has also recognized the importance of informal, administrative advocacy in advancing the ends of litigation under the Voting Rights Act. In *Posada v. Lamb County, Texas,* 716 F.2d 1066, 1071 (5th Cir.1983), we confirmed that "A 'prevailing party' is one whose 'ends are accomplished as the result of the litigation even without formal judicial recognition'" (citing three 5th Circuit cases and one Supreme Court case).[2] In the present case, moreover, the prevailing plaintiffs *did* have formal judicial recognition of their activities in the pre-clearance review process. As the majority concedes,

> The plaintiffs ... filed an action under section 5 of the Voting Rights Act, 42 U.S.C. § 1937c. They sought an injunction to prevent further elections under the 1975 plan and to order the county to develop a new plan.... MALDEF succeeded in enjoining further use of the 1975 plan in October 1979.... Because of the injunction, Jim Wells County then submitted three plans in succession to the Justice Department for preclearance.... In addition to submitting proposed plans, MALDEF undertook other activities in connection with the preclearance process, primarily lobbying with county and federal officials.... According to MALDEF, the suit for an injunction was not over because the district court retained jurisdiction and had a continuing obligation to secure compliance with the injunction.... [A]s MALDEF

points out, the district court retained jurisdiction ... to insure compliance with the injunction....

*Supra* at 507, 508.

In order to recover attorney's fees under the Voting Rights Act the prevailing party must show "a causal connection between the filing of the suit and the *defendant's* action." *Williams v. Leatherbury,* 672 F.2d 549, 551 (5th Cir.1982) (emphasis added). In *Posada* we provided the following gloss on the requisite causal connection:

> Causal connection is established by evidence that the plaintiffs' lawsuit was a "substantial factor or a significant catalyst in motivating the *defendants* to end their unconstitutional behavior".... The plaintiffs do not have to prove that their efforts were the sole reason for the *defendant's* rectifying actions. Some award is due so long as the plaintiffs' actions made an important contribution to the improvements achieved.

*Posada,* 716 F.2d at 1072 (citing three 5th Circuit cases and one Supreme Court case) (emphasis added).

In sharp contradistinction to the authorities cited above, the district court in this case declined to award attorney's fees because "there is no convincing tie-in between Plaintiffs' complaints expressed in their comments *to the Attorney General* and his results." Order Awarding Attorneys' Fees, at 4 (emphasis added). As we acknowledged in *Posada,* plaintiffs must show that their work "had a substantial independent effect on the outcome of the preclearance review" and indeed "changed the result that the Attorney General would otherwise have reached." 716 F.2d at 1075. But there is more than one way to change the Attorney General's mind. The district court, and the majority opinion, fail to consider plaintiffs' effects on the *defendants* in this case. The plaintiffs may have achieved some of the results they sought through the indirect route of influ-

---

**2.** *Cf.* S.Rep. No. 295, 94th Cong., 1st Sess. 41 (1975), *reprinted in* [1975] U.S.Code Cong. & Ad.News 774, 808 ("for purposes of the award of counsel fees, parties may be considered to have

prevailed when they vindicate rights through a consent judgment or without formally obtaining relief").

encing the defendants to submit fairer redistricting plans. Although MALDEF pointed repeatedly to the striking similarity between the plan it advocated from the beginning and the plan eventually submitted by the county, the district court failed to make findings of fact on this issue.

Thus I would remand this case to the district court for a determination as to whether MALDEF achieved its objectives, at least in part, by persuading the county to submit an appropriate plan for approval. This is, as we noted in *Posada*, "an intensely factual, pragmatic" inquiry. 716 F.2d at 1072. But there can be little doubt that something of the sort described by MALDEF took place. As the majority concedes, "*Because of* the injunction, Jim Wells County ... submitted three plans in succession to the Justice Department for preclearance." *Supra* at 507 (emphasis added). And the district court concludes that "Although Plaintiffs were not successful in all of their endeavors, they were successful in enforcing the rights of the Mexican-Americans to an undiluted vote...." Order Awarding Attorney's Fees, at 8.[3]

The majority seems to acknowledge that Voting Rights Act plaintiffs can often obtain effective relief only by participating in preclearance submissions, but nevertheless denies that Congress intended for such plaintiffs to be compensated for attorney's fees. I find that puzzling. If Congress intended the end, then Congress must be supposed to have intended the means to that end. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 407–22, 4 L.Ed. 579 (1819) ("It must have been the intention of those who gave these powers, to insure, so far as human prudence could insure, their beneficial execution."). And, in fact, Congress expressed its intentions in these matters quite well:

[I]n voting rights cases ... Congress depends heavily upon private citizens to enforce the fundamental rights involved. Fee awards are a necessary means of enabling private citizens to vindicate these Federal rights.... A party seeking to enforce the rights protected by the Constitutional clause or statute under which fees are authorized by these sections, if successful, "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman v. Piggie Park Enterprises, Inc.,* 88 S.Ct. 964 [966], 390 U.S. 400, 402, 19 L.Ed. 1263 (1968).... Courts have been instructed, since the passage of our first civil rights laws, to use the broadest and most effective remedies available to achieve the goals of these laws, and these remedies have included awards of attorneys' fees as costs.

S.Rep. No. 295, 94th Cong., 1st Sess. 40–42 (1975), *reprinted in* [1975] U.S.Code Cong. & Ad.News 774, 807–09.

Accordingly, I respectfully dissent.[4]

---

3. As the Supreme Court has recently admonished in a related context, "a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.... [T]he court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. *The result is what matters.*"

*Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1943, 1940, 76 L.Ed.2d 40 (1983) (emphasis added).

4. I do, however, join in the discussion of costs and hourly rates contained in Part V of the court's opinion.